## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Akanthos Capital Management, LLC; Aria Opportunity Fund Ltd.; AQR Absolute Return Master Account, L.P.; CC Arbitrage, Ltd; CNH CA Master Account, L.P.; Galileo Partners Fund I, L.P.; GLG Investments plc: sub-fund GLG Global Convertible UCITS Fund; GLG Investments IV plc: sub-fund GLG Global Convertible UCITS (Distributing) Fund; GLG Global Convertible Fund plc; GLG Market Neutral Fund; Highbridge International LLC; Kamunting Street Master Fund, Ltd.; KBC Financial Products (Cayman Islands) Ltd.; Kingstown Partners, L.P.; Pandora Select Advisors, LLC; Parsoon Opportunity Fund Ltd.; Tenor Opportunity Master Fund, Ltd.; Whitebox Advisors, LLC; Whitebox Combined Advisors, LLC; Whitebox Convertible Arbitrage Advisors, LLC; and Whitebox Hedged High Yield Advisors, LLC; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Civil No. _____** |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| CompuCredit Holdings Corporation, | ) ) | |
| Defendant. | ) ) | |

**Civil No. _____**

**COMPLAINT**

Plaintiffs Akanthos Capital Management, LLC ("Akanthos"), Aria Opportunity Fund Ltd. ("Aria"), AQR Absolute Return Master Account, L.P. ("AQR"), CC Arbitrage, Ltd. ("CC"), CNH CA Master Account, L.P. ("CNH"), Galileo Partners Fund I, L.P. ("Galileo"), GLG Investments plc: sub-fund GLG Global Convertible UCITS Fund

("GLG Investments"), GLG Investments IV plc: sub-fund GLG Global Convertible UCITS (Distributing) Fund ("GLG IV"), GLG Global Convertible Fund plc ("GLG Global"), GLG Market Neutral Fund ("GLG Market Neutral"), Highbridge International LLC ("Highbridge"), Kamunting Street Master Fund, Ltd. ("Kamunting Street"), KBC Financial Products (Cayman Islands) Ltd. ("KBC"), Kingstown Partners, L.P. ("Kingstown"), Pandora Select Advisors, LLC ("Pandora"), Parsoon Opportunity Fund Ltd. ("Parsoon"), Tenor Opportunity Master Fund, Ltd. ("Tenor"), Whitebox Advisors, LLC ("Whitebox Advisors"), Whitebox Combined Advisors, LLC, ("Whitebox Combined"), Whitebox Convertible Arbitrage Advisors, LLC ("Whitebox Convertible"), and Whitebox Hedged High Yield Advisors, LLC ("Whitebox Hedged"), by their undersigned attorneys, for their claims against Defendant CompuCredit Holdings Corporation ("CompuCredit" or "the Company"), states and alleges as follows:

## INTRODUCTION

1.      Plaintiffs collectively own or have an interest in a majority of the 3.625% convertible senior notes due 2025 issued by CompuCredit pursuant to an indenture dated May 27, 2005 ("3.625% Notes) and 5.875% convertible senior notes due 2035 issued by CompuCredit pursuant to an indenture dated November 23, 2005 ("5.875% Notes) (collectively, the "Notes").  All beneficial holders of the Notes are referred to herein as the "Noteholders."

2.      CompuCredit, a subprime financial services provider, is a public company owned primarily by David Hanna, the CEO, his brother Frank, and other corporate insiders.  In its latest quarterly filing on November 9, 2009, the Company once again

emphasized to the marketplace that it is in severe financial distress.  The Company reported plunging asset values on its balance sheet, alarming and increasing losses, a disturbing lack of liquidity and, perhaps most disturbingly, the possibility that the Company will not be in a position to meet its obligation to repay more than $230 million of Notes in 2012.

3.     One thing that the Company's filings clearly did not suggest was that shareholders should anticipate distributions any time soon, particularly in light of the Company's significant debt obligations.  CompuCredit has approximately $390 million in Notes outstanding, of which $231.5 million are due to be repurchased by the Company in May 2012 at par – a responsibility which, as mentioned above, the Company indicated that it does not believe it can meet given its current circumstances.

4.     Less than a month after the above filing, however, the Company revealed a startling response to the challenges it faced: a decision to funnel as much cash and assets to management and other corporate insiders as possible, while leaving the holders of the Company's Notes holding the bag.  In a December 3, 2009 press release (attached hereto as Ex. A), the Company announced a massive cash dividend of almost $25 million – an amount that constituted over twenty percent of the market capitalization of the Company at the time (and nearly twenty-five percent of its last reported available cash).  It was the first dividend the Company had ever declared, which was astonishing in light of the Company's stated liquidity crisis, its staggering ongoing losses, and its 2012 repurchase obligation.  In the same press release the Company, once again ignoring its obligations to

its creditors, also indicated that corporate insiders should expect additional cash dividends to be issued in the future.

5.      The Company didn't stop there, however. In addition to announcing its intention to issue a dividend that exceeded twenty percent of its current capitalization, the Company also announced its intention to spin off the microloan segment of its business – the *only segment of the Company's business that is currently generating a profit*.  Like the dividend, this asset would go to CompuCredit shareholders and therefore primarily to the CEO, his brother, and other corporate insiders.

6.      The Company has thus embarked on a deliberate strategy of stripping itself of assets, distributing those assets to insiders, and disabling itself from meeting its obligations to its creditors.  There is a phrase for such a strategy: the phrase is "fraudulent transfer," which the law does not permit in the guise of a dividend or otherwise.

7.      Finally, on a pro-forma balance sheet basis, the liabilities already exceed the Company's assets and its insolvency is imminent absent an unexpected resurgence in operations.  As a result, the Plaintiffs have determined that it is necessary to bring this action to protect the holders of the Notes by seeking an immediate halt to the Company's unlawful course of conduct before any of the proposed, unlawful transfers are consummated.

## PARTIES

8.      Plaintiff Akanthos is a Delaware limited liability company.  Through an affiliated investment fund of which it is the general partner, it holds $14,500,000 in face

value of the 3.625% Notes and $15,250,000 in face value of the 5.875% Notes.  It is not a citizen of Georgia.

9.      Plaintiffs Aria, Parsoon, and Tenor are Cayman Island companies. Collectively, Aria, Parsoon, and Tenor hold $23,400,000 in face value of the 3.625% Notes.

10.      Plaintiffs AQR and CNH are Cayman Islands master limited partnerships. Collectively, AQR and CNH hold $20,850,000 in face value of the 3.625% Notes and $26,000,000 in face value of the 5.875% Notes.  AQR and CNH are not citizens of Georgia.

11.      Plaintiff CC is a Cayman Islands company.  It holds $4,610,000 in face value of the 5.875% Notes.

12.      Plaintiff Galileo is a Delaware limited partnership.  It holds $4,500,000 in face value of the 3.625% Notes. It is not a citizen of Georgia.

13.      Plaintiffs GLG Investments, GLG IV, and GLG Global are public limited companies incorporated in, and with their principal place of business in, Ireland.  Plaintiff GLG Market Neutral is an exempted company with limited liability incorporated in, and with its principal place of business in, the Cayman Islands.   Collectively, GLG Investments, GLG IV, GLG Global, and GLG Market Neutral hold $2,821,000 in face value of the 3.625% Notes and $11,964,000 in face value of the 5.875% Notes.

14.      Plaintiff Highbridge is a Cayman Islands limited liability company.   It holds $20,000,000 in face value of the 5.875% Notes.  It is not a citizen of Georgia.

15.     Plaintiff Kamunting Street is a Cayman Islands company.   It holds $6,005,000 in face value of the 3.625% Notes and $1,750,000 in face value of the 5.875% Notes.

16.     Plaintiff KBC is a Cayman Islands company.  It holds $18,000,000 in face value of the 3.625%.

17.     Plaintiff Kingstown is a Delaware limited partnership.  It holds $5,495,000 in face value of the 3.625% Notes and $1,000,000 in face value of the 5.875% Notes.  It is not a citizen of Georgia.

18.     Plaintiffs Pandora, Whitebox Advisors, Whitebox Combined, Whitebox Convertible, and Whitebox Hedged are each Delaware limited liability companies and residents of Minnesota.  Collectively, through investment funds of which each is a general partner, Pandora, Whitebox Advisors, Whitebox Combined, Whitebox Convertible, and Whitebox Hedged hold $16,405,000 in face value of the 3.625% Notes and $11,741,000 in face value of the 5.875% Notes.  Pandora, Whitebox Advisors, Whitebox Combined, Whitebox Convertible, and Whitebox Hedged are not Georgia citizens.

19.     Defendant CompuCredit Holdings Corporation, a Georgia corporation with its principal place of business in Atlanta, Georgia, is a financial services holding company.

20.     CompuCredit Holdings Corporation was created pursuant to a corporate reorganization completed on June 30, 2009.  In that reorganization, the former parent company, CompuCredit Corporation, became a wholly owned subsidiary of

CompuCredit Holdings Corporation.   CompuCredit Corporation and CompuCredit Holdings Corporation are collectively referred to herein as "CompuCredit."

## VENUE AND JURISDICTION

21.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and of foreign states and the amount in controversy exceeds $75,000.

22.     This court has personal jurisdiction over Defendant because CompuCredit, or a closely integrated subsidiary acting on its behalf, has substantial operations and conducts substantial business in Minnesota.   One of the six office locations listed on CompuCredit's website is in St. Cloud, Minnesota.   As a result, CompuCredit has such systematic and continuous contacts with Minnesota that it is subject to the general jurisdiction of Minnesota's courts.

23.     Furthermore, with respect to the Notes that underlie this suit, CompuCredit has and continues to direct activities toward Minnesota through its relationship with the indenture trustee, U.S. Bank.   On information and belief, U.S. Bank services the Notes through its offices in Minnesota, including receiving fees and any payments to Noteholders.

24.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(a) a substantial part of the events giving rise to the claim occurred in this district and this action concerns Notes which are administered by an indenture trustee sitting in this district.

## FACTS

25.     CompuCredit is, according to its investor relations website, "a provider of various credit and related financial services and products to or associated with the underserved, or sub-prime, consumer credit market."  Within this sub-prime consumer credit market, CompuCredit has four main business segments: (1) credit cards, (2) auto lending, (3) retail micro-loans, and (4) Jefferson Capital Systems, LLC, a "subsidiary that provides innovative and non-traditional debt recovery solutions."

26.     CompuCredit, while its stock is publicly traded on NASDAQ under the ticker symbol "CCRT", is primarily owned by corporate insiders.  The Company's Chairman and CEO, David Hanna, together with his brother, owns approximately 54% of the Company's equity, and the Chief Operating Officer and an outside director together own nearly 9% of the Company's stock (although they each disclaim beneficial ownership of at least some portion of their holdings).

27.     Upon information and belief, neither CompuCredit Holdings nor its predecessor corporation has ever paid a dividend to stockholders.  In fact, CompuCredit's Investor Relations website continues to state that the Company has a policy of not paying dividends.  Specifically, CompuCredit's website states:

> **Does CompuCredit pay dividends? Does CompuCredit have a dividend reinvestment plan?**
>
> CompuCredit currently does not pay dividends. We are guided by a strategy focusing on long-term success and believe the best opportunity for long-term appreciation of our capital is continue to finance our operations and growth[.]

"Investors FAQ," available at
http://investor.compucredit.com/phoenix.zhtml?c=115652&p=irol-faq, last
accessed December 20, 2009.

## COMPUCREDIT IS ADMITTEDLY HEMORRHAGING CASH AND FACING A LIQUIDITY CRISIS.

28.     The widespread and well-known problems in the subprime financial services sectors have hit CompuCredit especially hard, as the Company made clear when it declared that it is facing a liquidity crisis in its most recent 10-Q quarterly filing with the SEC, dated November 9, 2009 (the "November 10-Q").  Specifically, the Company declared that "we have no meaningful access to liquidity," and that "significant uncertainties" exist as to when liquidity markets will improve.

29.     In the November 10-Q, the Company also declared that it had lost $239 million in the last quarter, and a total of $487 million in the last year to date.  It stated that as of September 30, 2009, the Company's shareholders possessed only $238 million in equity, a number which (if it is not overstated) only narrowly exceeds the amount it has lost in the last quarter.

30.     Moreover, on information and belief, reasonable adjustments to CompuCredit's reported equity, based upon disclosures regarding its off-balance sheet risks and non-cash adjustments, renders its liabilities greater than its assets by approximately $186 million.  Thus, on a pro-forma balance sheet basis, the company is insolvent or imminently so.  The ability of CompuCredit to pay debts generally as they become due is increasingly in doubt absent extreme, unexpected and immediate improvement in its operations.

31.     Given these dramatic losses, the Company repeatedly emphasized the need to preserve its remaining capital in the November 10-Q.  For instance, the Company reduced operating expenses resulting from "decreases in marketing and solicitation costs due to ***our desire to preserve capital*** given the ongoing dislocation of the liquidity markets and our corresponding scale back of our credit card marketing efforts…"  The Company further stated that "[g]iven our ***current focus on cost-cutting and capital preservation*** in light of the continuing dislocation in the liquidity markets and significant uncertainties as to when those markets will improve, we expect further reductions in marketing efforts and expense levels and in most other cost categories … in the next several quarters."  (emphasis added).  The Company further stated that it was managing its business "with the assumption that the liquidity markets will not return to more traditional levels in the near term."

32.     CompuCredit's near term financial outlook is particularly bleak in light of imminent substantial financial obligations.  In January 2010, the Company's $750 million credit facility (its largest) expires.  CompuCredit has disclosed that "our failure to renew or replace a maturing financing or securitization facility (except where the facility may represent excess and unneeded capacity) could potentially result in (1) asset seizures by our lenders or investors, which in turn would result in impairments to the book value of our equity, and/or (2) accelerated repayment amortization schedules, including early amortization, which over time could impair the profitability of the assets underlying the facility."  In the face of the abysmal credit environment for CompuCredit's business, the Company's heavy dependence on securitizations and other borrowings to finance its

operations greatly increases the risk of asset fire sales and other measures detrimental to its financial viability.

33.    As CompuCredit is aware, the holders of the 3.675% Notes have a right to put those Notes in May 2012.  In the November 10-Q, CompuCredit indicated that it will not be able to meet that obligation through operation of its business, given the current financial state of the Company (even before announcing the Dividend), and must rely on the speculative possibility that it can raise the money through securities offerings. Specifically, CompuCredit stated that "given our current liquidity position and future liquidity prospects …, we may need to rely on debt or equity issuances or possible exchange offerings, ***none of which are assured***, in order to meet our May 2012 obligation to satisfy, in cash payments, conversions of" the 3.675% Notes, "of which $231.5 million in face amount is outstanding." (emphasis added)

34.    In the November 10-Q, CompuCredit stated that it intended to pursue a strategy to compromise the rights of the Noteholders.  Specifically, the Company assured shareholders that it would "evaluate and pursue additional opportunities to repurchase our convertible senior notes … at discounts to face amounts."

### COMPUCREDIT ANNOUNCES PLAN TO STRIP THE COMPANY'S CASH AND SPIN OFF ONLY PROFITABLE SEGMENT.

35.    Less than a month after declaring that the Company was "focus[ed] on cost-cutting and capital preservation" and in spite of its stated policy not to pay dividends, CompuCredit issued a press release on December 3, 2009 (the "Press Release") announcing that "its Board of Directors has declared a dividend of $.50 per share payable

to holders of record as of the close of trading on December 31, 2009," to be paid "on or after December 31, 2009, but not later than February 28, 2010." The Press Release also stated that the Company's board "also is evaluating the declaration of additional cash dividends in the future."

36.     With nearly 50 million shares currently outstanding, this announced dividend will result in the stripping of almost $25 million of the Company's rapidly dwindling assets, with over half of that amount going to corporate insiders.

37.     The announced dividend flies in the face of the Company's staggering ongoing losses, its acknowledgement of the dire credit environment in which it is operating, and its stated goal of preserving capital to shore up its operations.

38.     The announced dividend is transparently intended to force the Noteholders to convert the Notes at a significant discount by telling them that the Company has no interest in fulfilling its obligations under the Notes just as the Company suggested that it would do in the November 10-Q.   The Press Release is not bashful about the Company's intentions to shortchange Noteholders stating that "[t]he payment of this cash dividend will entitle holders of the Company's convertible notes to convert their notes and receive, using an assumed December 2, 2009 closing trading price of the Company's stock, either approximately $74.79 or approximately $61.46 for each $1,000 face amount of notes, depending upon which series is held."

39.     Just in case Noteholders did not get the message that CompuCredit did not intend to fulfill its obligations under the Notes, the Company also announced in the Press Release that "it is considering a tax-free spin-off of its U.S. and U.K. micro-loan

businesses into a publicly-traded company called Purpose Financial Holdings, Inc."
According to the Press Release, "[t]he businesses to be evaluated for spin-off had
revenues of approximately $98.4 million and $107.2 million for the nine months ended
September 30, 2009 and year ended December 31, 2008, respectively."

40.     In other words, the Press Release told Noteholders that while the Company
as a whole was losing money to the tune of hundreds of millions of dollars per quarter,
the Company was proposing to spin off the only portion of the business that had been
generating revenue (over $100 million in annual revenues) and take another $25 million
out of the corporate coffers primarily for the benefit of insiders.   The message to
Noteholders is clear: convert your Notes, because the Company's management has no
interest in leaving the Company with enough assets to pay you what you are due.   These
actions are not only an unfair inversion of the traditional preference for debt holders over
equity holders, they are barred by the Uniform Fraudulent Transfer Act and the Georgia
Corporate Code.

## COUNT I

## Uniform Fraudulent Transfer Act

41.     Plaintiffs repeat and reallege paragraphs 1-40 as though set forth fully
herein.

42.     The Uniform Fraudulent Transfer Act provides in section 4 that a transfer
made by a debtor is fraudulent as to a creditor if the debtor made the transfer "without
receiving a reasonably equivalent value in exchange for the transfer or obligation" –
surely the case here – and the debtor either: "was engaged or was about to engage in a

business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

43.     The Transaction is a fraudulent transfer because the Company is planning the Transaction to purposefully divert cash and assets to insiders, leaving "remaining assets" that are "unreasonably small" and debts that are "beyond [the Company's] ability to pay." Each element of the Transaction individually constitutes a fraudulent transfer for the same reasons.

44.     Alternatively, section four of the Uniform Fraudulent Transfer Act provides that a transfer is fraudulent if made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."

45.     The Transaction is a fraudulent transfer because it is intended to enrich the insiders of the Company and to hinder the creditors, especially the Noteholders. Each element of the Transaction individually constitutes a fraudulent transfer for the same reasons.

46.     Moreover, as to the Noteholders, whose claims arose prior to the Transaction, a transfer is fraudulent under section five "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer … and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer."

47.     The Transaction is a fraudulent transfer under section five because CompuCredit is not receiving a reasonably equivalent value in exchange for the Transaction and CompuCredit is insolvent or will become insolvent as a result of the Transaction. Each element of the Transaction individually constitutes a fraudulent transfer for the same reasons.

48.     Section seven of the Uniform Fraudulent Transfers Act entitles Plaintiff to relief, including "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim", "[a]n injunction against further disposition by the debtor … of the asset transferred or of other property", or "[a]ny other relief the circumstances may require."

49.     Plaintiffs are entitled to both a preliminary and permanent injunction enjoining the Transaction.

   a.   Plaintiffs will establish on the merits that the Transaction constitutes an illegal fraudulent transfer.

   b.   Because the Transaction will serve to dissipate the Company's assets and cripple its ability to earn future revenue, if it is allowed to proceed, Plaintiffs will suffer irreparable injury and will be left without any adequate remedy at law.

   c.   The potential harm to Plaintiffs outweighs any harm likely to be suffered by the Defendant by an injunction barring the Transaction.

   d.   An injunction barring the Company from proceeding with the Transaction will not be adverse to the public interest.

WHEREFORE, Plaintiffs requests a preliminary and permanent injunction barring the Company from proceeding with the Dividend and the Spin Off or any other transfer of assets without approval of the Court, as well as an award of any damages and costs.

## COUNT II

### Georgia Corporate Code

50.     Plaintiffs repeat and reallege paragraphs 1-49 as though set forth fully herein.

51.     The Georgia corporate code does not permit dividends if after the dividend is paid, the Company would be insolvent on a balance sheet or cash flow basis. Specifically, a dividend may not be made if, after distribution of the dividend, "[t]he corporation would not be able to pay its debts as they become due in the usual course of business" or "[t]he corporation's total assets would be less than the sum of its total liabilities…" Ga. Code Ann. § 14-2-640(c).

52.     The Company will not be able to meet its obligations under the Notes if it makes the announced Dividend and/or the Company's total assets would be less than the sum of its total liabilities.

53.      Plaintiffs are entitled to both a preliminary and permanent injunction enjoining the Dividend.

        a. Plaintiffs will establish on the merits that the Dividend is barred by the Georgia corporate code.

    b.  Because the Dividend will serve to dissipate the Company's rapidly dwindling assets, if it is allowed to proceed, Plaintiffs will suffer irreparable injury and will be left without any adequate remedy at law.

    c.  The potential harm to Plaintiffs outweighs any harm likely to be suffered by the Defendant by an injunction barring the Dividend.

    d.  An injunction barring the Company from proceeding with the Dividend will not be adverse to the public interest.

WHEREFORE, Plaintiffs request a preliminary and permanent injunction barring the Company from proceeding with the Dividend, as well as an award of any damages and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

1.    Enter judgment in favor of Plaintiffs and against Defendant;

2.    Grant Plaintiffs  preliminary and permanent injunctive relief barring Defendant from proceeding with the Dividend and the Spin Off or any other transfer of assets without approval of the Court;

3.    Award Plaintiffs their costs, disbursements, attorneys' fees and witness fees herein; and

4.    Grant Plaintiffs such other and further relief as is just and equitable.

Dated:  December 21, 2009

**ROSS & ORENSTEIN LLC**

By:    s/Bernard E. Nodzon

   Jeff Ross (#0144782)
100 South Fifth Street, Suite 1200
Minneapolis, MN  55402
Telephone:  (612) 436-9801
Facsimile:  (612) 436-9819

**FAEGRE & BENSON LLP**

   James L. Volling (#113128)
   Michael F. Cockson (#294329)
   Bernard E. Nodzon (#032422X)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:  (612) 766-7000
Facsimile:  (612) 436-1600

**ATTORNEYS FOR PLAINTIFFS**

FB.US.4675953.05